IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY GERSTADT, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 08-4869 |
| | : | |
| LEHIGH VALLEY INFECTIOUS | : | |
| DISEASE SPECIALISTS, et al., | : | |
| Defendants | : | |

**M E M O R A N D U M**

STENGEL, J.                                                                                              March 30, 2009

Dr. Kimberly Gerstadt was offered a job with Lehigh Valley Infectious Disease Specialists (LVIDS).  Her employment was contingent on obtaining staff privileges at Lehigh Valley Hospital.  When she began to prepare her application for the hospital's credentialing committee, Dr. Gerstadt was several weeks pregnant and suffering from morning sickness.   Despite numerous letters of recommendation and support, her application was ultimately rejected.  Because she failed to receive staff privileges, LVIDS withdrew its offer to Dr. Gerstadt.  Her complaint alleges that the interviewers and other staff members knew of her pregnancy and used it against her.

Dr. Gerstadt filed this suit against LVIDS, two corporate parent organizations (the Lehigh Valley Health Network, Inc., and the Lehigh Valley Physician Group), and five individual physicians for discriminating against her because of her pregnancy.  The defendants have filed a partial motion to dismiss.  After reviewing the parties' memoranda I will grant the motion in part and deny it in part.

**I. Background**

Dr. Kimberly Gerstadt is an infectious disease physician. (Am. Compl. ¶ 5.) Lehigh Valley Infectious Disease Specialists (LVIDS) agreed to hire her in December 2006. (Id. ¶ 19.) At the time, LVIDS was an independent business organization that was "operated, controlled, and managed" by Lehigh Valley Physician Group (the Physician Group) and/or Lehigh Valley Health Network, Inc. (the Health Network). (Id. ¶ 6.) It is now wholly owned and operated by the Physician Group. (Id.) The Physician Group is wholly owned and operated by the Health Network. (Id. ¶ 7.)

A condition of Dr. Gerstadt's employment was that she obtain staff privileges at Lehigh Valley Hospital. (Id. ¶ 20.) Lehigh Valley Hospital is also owned and operated by the Health Network. (Id.) She began her application for staff privileges in January 2007, and the credentialing committee was scheduled to review it in April 2007. (Id. ¶¶ 21–22.)

The application process consisted of a series of interviews with members of the medical staff. (Id. ¶ 23.) In late March, the hospital contacted Dr. Gerstadt and informed her that an interview with Dr. Linda Lapos, President of the Medical Staff, had been inadvertently left out. (Id. ¶ 24.) Dr. Gerstadt would have to come back to the hospital to complete that interview. (Id.) At the time, she was approximately seven weeks pregnant and was experiencing severe morning sickness. (Id. ¶ 25.) She asked whether the interview could be delayed or be done over the phone, instead of in-person. (Id. ¶ 26.) She was told no exceptions would be made. (Id. ¶ 27.)

On April 9, 2007, Dr. Gerstadt went to meet Dr. Lapos, and was again experiencing severe morning sickness. (Id. ¶¶ 28–29.) While at the hospital, Dr. Gerstadt was told she would need to undergo a physical at least five days before she started work. (Id. ¶ 30.) Unsure of whether she would be able to return to the hospital again, she explained her pregnancy and the morning sickness, and asked if the physical could be performed that same day. (Id. ¶¶ 31–32.) She was told no exceptions would be made. (Id.)

On April 10, 2007, Dr. Gerstadt was contacted by Dr. Luther Rhodes and was asked to come back to the hospital to discuss a few issues. (Id. ¶¶ 34–35.) She went back in on April 12 and met with Drs. Jaan Naktin, Theresa Ryan-Mitlyng, and Rhodes. (Id. ¶ 36.) She was told that a reference from Crozer-Chester Medical Center was "not good." At the interviewers' request, she provided three more letters of recommendation from Crozer-Chester. (Id. ¶¶ 37–38.) The hospital then requested four more letters from Crozer-Chester. (Id. ¶ 40.) All seven letters were positive. (Id. ¶ 41.)

Drs. Rhodes and Naktin wrote letters supporting Dr. Gerstadt's application. (Id.) It is not known if Dr. Ryan-Mitlyng wrote a positive letter as well. (See id. (stating that Drs. Rhodes and Naktin wrote letters, but not if Dr. Ryan-Mitlyng had).)

Dr. Gerstadt's application was then sent to be reviewed by Dr. John Vanbrakle, Chair of the Credentialing Committee. (Id. ¶ 42.) He reportedly saw no problems. (Id. ¶ 43.) Other physicians at LVIDS spoke with Dr. John Fitzgibbons, Chair of the Health

Network's Department of Medicine, to express their support since he was responsible for presenting Dr. Gerstadt's application. (Id. ¶ 45.)

At the May 10 Credentialing Committee meeting, the application was denied. (Id. ¶ 47.) Dr. Fitzgibbons did not attend the meeting. (Id. ¶ 48.) Within a few days of this decision, Dr. Gerstadt received two letters. The first came from the Health Network and was written by Dr. Ryan-Mitlyng. (Id. ¶ 49.) It stated that Dr. Gerstadt could not be employed at LVIDS because her credentialing application had been rejected. (Id.) The second letter, which came from Dr. John Hart on behalf of the hospital, stated that "since LVIDS had withdrawn their offer of employment, her application for staff privileges [at Lehigh Valley Hospital] was considered withdrawn." (Id. ¶ 51.)

Based on these facts, Dr. Gerstadt filed a complaint containing four counts: (1) pregnancy discrimination and disparate treatment in violation of Title VII[1]; (2) hostile work environment, pregnancy discrimination, retaliation, and disparate treatment in violation of the Pennsylvania Human Relations Act (PHRA)[2]; (3) breach of contract; and (4) interference with contractual relations. (Id. ¶¶ 67–78.) She has also sued five of the

---

[1] Title VII provides that "[i]t shall be an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e.

[2] The PHRA provides "[t]he opportunity for an individual to obtain employment for which he is qualified . . . without discrimination because of race, color, familial status, religious creed, ancestry, handicap or disability, age, sex, national origin . . . ." Courts interpret the PHRA consistently with Title VII. Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001) ("The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.").

physicians under the PHRA for aiding and abetting the discrimination: Dr. Fitzgibbons, Dr. Lapos, Dr. Vanbrakle, Dr. Ryan-Mitlyng, and Dr. Hart.

The defendant's Motion to Dismiss (Document #8) challenges all claims except for the Title VII and the PHRA against LVIDS, the Health Network, and the Physician Group. The plaintiff's response was late and includes a request for leave to file out of time. (See Pl.'s Mot. for Leave to File (Document #12).)

## II. Standard of review

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The factual allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 US 544, 127 S.Ct. 1955, 1965 (2007). In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Id. See also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim. Conley, 355 U.S. at 47. Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must

allege facts suggestive of [the proscribed] conduct." Twombly, 127 S.Ct. at 1969. Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 127 S.Ct. at 1965)).

**III. Discussion**

    **a) Leave to file**

I will grant the request for leave to file. Counsel for the defendants has been notified of the untimeliness of plaintiff's response and does not object. (Pl.'s Mot. for Leave to File ¶ 11.)

    **b) Uncontested dismissal of retaliation, hostile work environment, and breach of contract claims**

Because Dr. Gerstadt concedes to dismissing her retaliation and hostile work environment claims under the PHRA, her breach of contract claim, and her request for punitive damages for those claims, I will dismiss them.

**c) Tortious interference with contractual relations**

In Pennsylvania, the elements of a claim for tortious interference with existing or prospective contractual relations are:

> (1) The existence of a contractual relationship, or a prospective contractual relationship;
>
> (2) An intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship or that potential relationship;
>
> (3) The absence of a privilege or justification for such interference; and
>
> (4) Damages resulting from the defendant's conduct.

ClubCom, Inc. v. Captive Media, Inc., 2009 WL 249446, at *11 (E.D. Pa. Jan. 31, 2009); Small v. Juniata Coll., 682 A.2d 350, 354 (Pa. Super. Ct. 1996). The defendants do not dispute the first element. They argue that (1) they engaged in no tortious conduct, and (2) Dr. Gerstadt has not shown that LVIDS is independent of the Health Network and/or the Physician Group. I will deny the motion as to both arguments.

**1) Presence of wrongful conduct**

Unlike other intentional torts, a claim for intentional interference with contractual relations turns on whether the defendant's interference was improper or not. See Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1184 n.17 (Pa. 1978) (quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1982)). As another comment to that section indicates, "the interference [must] be both *intentional and improper*." RESTATEMENT (SECOND) OF TORT § 767 cmt. a (emphasis added).

When determining whether the defendant's conduct was improper, Pennsylvania courts have traditionally relied on Section 767 of the Restatement (Second) of Torts. See, e.g., Adler, Barish, 393 A.2d at 1184 ("We are guided, too, by Section 767 of Restatement (Second) of Torts, which focuses on what factors should be considered in determining whether conduct is 'improper.'"); Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa. Super. Ct. 1997); see also Triffin v. Janssen, 626 A.2d 571, 574 n.4 (Pa. Super. Ct. 1993) (providing a string citation of Pennsylvania state court cases that have consulted the Restatement (Second) of Torts when analyzing intentional interference with contractual relations claims).

To guide the court's inquiry, Section 767 provides the following factors:

(1)   the nature of the actor's conduct;

(2)   the actor's motive;

(3)   the interests of the other with which the actor's conduct interferes;

(4)   the interests sought to be advanced by the actor;

(5)   the social interests in protecting the freedom of action of the actor and the contractual interests of the other;

(6)   the proximity or remoteness of the actor's conduct to the interference;

(7)   the relations between the parties.

§ 767. By necessity, this is a case-specific determination requiring analysis of the facts in light of the listed factors. Id. cmt. b (stating that the inquiry is to determine "whether the

interference [was] improper or not *under the circumstances*." (emphasis added)); see, e.g., Strickland v. Univ. of Scranton, 700 A.2d 979, 985–86 (Pa. Super. Ct. 1997) (engaging in a factual analysis using the factors listed in Section 767 in finding that the defendant's conduct was not improper).

The defendants argue that the only "wrongful" conduct presented in the complaint is the Health Network and the Physician Group's breach of their own bylaws. (Def.'s Mem. at 16.) They state that "such conduct—breaching bylaws—[is] neither tortious nor illegal." (Id. at 17.) No additional information on what those bylaws require or how the defendant violated them was provided.

The defendants construe the complaint too narrowly and miss its thrust. Reading the complaint liberally, I find that it states that the Health Network and the Physician Group were motivated in part by Dr. Gerstadt's pregnancy to deny her application. (See Am. Compl. ¶ 54 ("Dr. Kimberly Gerstadt believes, and therefore avers, that Defendants engaged in invidious discrimination against her because she was pregnant.").) The bylaw violation is referenced in only one paragraph; the near entirety of the complaint's presentation of the facts is focused on how the defendants used Dr. Gerstadt's pregnancy against her. To describe the bylaw violations as the only "wrongful conduct" identified in the complaint ignores all of these other pregnancy-related allegations. Consequently, I find that the complaint has stated that the defendants engaged in improper conduct.

First, the described conduct is illegal. Title VII of the Civil Rights Act prohibits employment discrimination on the basis of gender. 42 U.S.C. § 2000e-2(a) (2006).

When an employee's pregnancy was a motivating factor for an adverse employment decision, the employer has violated Title VII. See id. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated that practice."). Here, the complaint alleges that the defendants' employment decisions were based in part on improper considerations of Dr. Gerstadt's pregnancy. The illegality of the defendants' conduct favors finding their actions to be wrongful. See RESTATEMENT (SECOND) OF TORTS § 767 cmt. c ("Conduct specifically in violation of statutory provisions or contrary to established public policy may for that reason make an interference improper.").[3]

Second, the public's interests also weigh in favor of finding the conduct to be improper. There is no redeeming social value in gender-based employment discrimination. Denying a doctor staff privileges merely because she is pregnant, if true, is wrong and impedes society's interests.

Third, the defendants allegedly had no non-discriminatory reason for their decision. The complaint states that Dr. Gerstadt's application was supported by several positive letters of recommendation. A few of the interviewers spoke on her behalf to

---

[3] To the extent she bases her interference claim on the defendants' alleged discriminatory conduct, Dr. Gerstadt may be required to set forth the *prima facie* case for an interference with contractual relations claim in addition to showing that the interference was made on the basis of improper discrimination violating federal law. Wood v. Coleman, 1989 WL 29250, at *17 (E.D. Pa. Mar. 29, 1989).

members of the Credentialing Committee. Dr. Gerstadt's professionalism and competency were not called into question.

Accepting the complaint's factual allegations as true and drawing inferences in the plaintiff's favor, I find that it states that the Health Network and the Physician Group used the plaintiff's pregnancy as a negative factor in rejecting her application. Such considerations are illegal and constitute improper conduct. For these reasons, I will deny the motion as to this part.[4]

### 2) LVIDS is an independent third party

A necessary component of the tortious interference claim is the existence of three parties: the tortfeasor, the plaintiff, and a third party. Maier v. Maretti, 671 A.2d 701, 707 (Pa. Super. Ct. 1995). The plaintiff's contract must have been with someone other than the tortfeasor. Otherwise, no interference claim exists because the tortfeasor would simply be disrupting his own contractual relations. See RESTATEMENT (SECOND) OF

---

[4] Tied into the consideration of the defendants' conduct is their intent. See RESTATEMENT (SECOND) OF TORTS § 767(b) (stating that the actor's motive is a factor to be weighed in determining whether the conduct was improper). The defendants have not challenged this point, but it is an issue worth addressing because separating the analysis of whether the conduct was proper from the defendants' intent is a legal fiction of sorts. As the comments to Section 767 indicate, the defendant's motive is a key factor in determining whether his conduct was improper or not. § 767 cmt. d.

The plaintiff's burden extends beyond merely demonstrating that the defendant used illegal means. The plaintiff must also establish that the defendant intended to cause harm. This is not a requirement to prove that the defendant bore ill will against the plaintiff. Ruffing v. 84 Lumber Co., 600 A.2d 545, 550 (Pa. Super. Ct. 1991). Rather, in the case of prospective contractual relations, the plaintiff must show that the defendant intended to prevent the plaintiff's contract or acted with the knowledge that the injury was certain or substantially certain to occur as a result. See § 766 cmt. j (discussing the intent necessary to support a tortious interference claim); Glenn v. Park Point Coll., 272 A.2d 895, 899 (Pa. 1971) ("It must be emphasized that the tort we are considering is an intentional one: the actor is acting as he does for the purpose of causing harm to the plaintiff.").

TORTS § 766 (describing the tort by reference to three parties).  The defendants argue that Dr. Gerstadt pled herself out of court by alleging that the Health Network and the Physician Group operated, controlled, and managed LVIDS and that the three organizations are integrated and interrelated.  (Def.'s Mem. at 14.)  If true, then LVIDS was not "functionally independent" of the Health Network or the Physician Group, and no interference claim exists.  (Id.)

The problem is that the defendants construe the complaint against the plaintiff.  I must draw all reasonable inferences in the plaintiff's favor, and what I glean from the complaint is that some unspecified amount of control could be exercised by the Health Network and the Physician Group but that LVIDS remained independent at the time.  The complaint clearly states that LVIDS was "an independent business organization at the time of the incident" (Am. Compl. ¶ 6).  No additional information into how much control could be exercised or how much was actually exercised is presented.  Under the standard of review for a motion to dismiss, I read the complaint as stating that LVIDS maintained some amount of independence from the Health Network and the Physician Group.

I am also persuaded by Pennsylvania's stated preference for treating corporate parents and subsidiaries as separate bodies.  Even where a corporate parent has near-total control over a subsidiary, courts have declined to adopt a *per se* rule stating that the parent and subsidiary are one entity.  Nat'l Data Payment Sys. v. Meridian Bank, 212 F.3d 849, 856 (3d Cir. 2000) (recognizing situations where a corporate parent may be

privileged to interfere with its subsidiary's contractual relations). Instead, the inquiry has been focused on the parent's reasons for interfering. In National Data Payment Systems, the Third Circuit Court of Appeals provided a pithy summary on this point:

> In Green v. Interstate United Management Services Corp., 748 F.2d 827 (3d Cir. 1984), a parent corporation instructed its wholly-owned subsidiary not to sign a lease after an appraiser opined that the contract was a bad bargain. This Court found that the interference was privileged due to the parent's interest in preventing the dissipation of its subsidiary's assets. Similarly in Advent Systems Limited v. Unisys Corp., 925 F.2d 670, 673 (3d Cir. 1991), we noted that a prospective purchaser's "interest in the financial stability of its subsidiary and the need to avoid a situation where the two would be working at cross-purposes justified the disruption" of pending contract negotiations with a third party.

212 F.3d at 856. If a parent and its subsidiary were considered one and the same, then an inquiry into the parent's reasons for interfering would be unnecessary.[5] The parent would be incapable of interfering at all. The Third Circuit's analysis suggesting that a parent may interfere when it has a proper basis for doing so necessarily assumes that the parent and subsidiary are to be considered as separate entities.

The Pennsylvania Superior Court's consideration of these federal decisions narrowed their application but generally supports this proposition. See Shared Commc'ns Servs. of 1800-80 JFK Blvd, Inc. v. Bell Atl. Prop., Inc., 692 A.2d 570, 573 (Pa. Super. Ct. 1997) ("Although a parent and a wholly owned subsidiary do share common goals,

---

[5] This accords with a prior holding that a tortious interference claim is less likely to stand if the parent's conduct was motivated by "a genuine desire to protect legitimate business interests . . . ." Windsor Sec., Inc. v. Hartford Life Ins. Co., 986 F.2d 655, 665 (3d Cir. 1993). This suggests that a parent and its subsidiary can be separate entities for the purposes of this branch of tort claims.

they are still recognized as separate and distinct legal entities."). In Shared Communications, the court distinguished Advent Systems and Green by noting that the parent's privilege to interfere in those cases was based on its interest in preventing asset dissipation. Id. at 575. The court also suggested that the "privilege" may not exist in situations such as when the parent's motive for interference is to aggrandize itself. Id. Again, the logical consequence is that a parent corporation can be liable for tortiously interfering with the contractual relations of a wholly-owned subsidiary.[6]

Based on this case law, I find that the complaint has properly identified at least three distinct parties. The complaint states that LIVDS was "an independent business organization at the time of the incident" (Am. Compl. ¶ 6). When drawing all reasonable

---

[6] The Superior Court's treatment of a corporation and its subsidiary in the common law conspiracy context also provides grounds for denying the motion. Similar to a tortious interference claim, common law conspiracy in Pennsylvania requires the presence of more than one person. Thompson Coal Co. v. Pike Coal Co., 412 A.2d 466, 473 (Pa. 1979). Consequently, cases finding that a corporation and its subsidiary were liable of conspiracy *necessarily* found them to be separate entities.

In Shared Communications, the Superior Court considered whether a corporate parent could be found liable of engaging in common law conspiracy with a wholly owned subsidiary. 692 A.2d at 572–74. Rather than embracing a bright-line rule disregarding the formal corporate form in that context, see, e.g., Copperweld Corporation v. Independence Tube Corporation, 467 U.S. 752 (1984) (holding in part that a parent corporation cannot be liable of conspiring with its subsidiary for the purposes of the Sherman Antitrust Act), the court adopted a case-specific analysis of determining if the parent and subsidiary are truly separate or merely corporate alter egos. 692 A.2d at 574. As a guiding principle, the court stated that the corporate form should only be disregarded "in [those] limited circumstances when [it is] used to defeat public convenience, justify wrong, protect fraud or defend a crime." Id. at 573 (quoting Kashner v. Geisinger Clinic, 638 A.2d 980, 984 (Pa. Super. Ct. 1994)).

In finding that the evidence presented supported both a conspiracy claim and a tortious interference claim between the parent and subsidiary, the court found that the entities were created to be distinct entities, performed different operations, and had separate management and goals. Id. at 575. This suggests that where a sufficient delineation in management, operations, and goals exists, the corporate form is not so easily disregarded.

inferences in the plaintiff's favor, the complaint states that the Health Network and the Physician Group had some unspecified amount of control over LVIDS. How much control could be exercised or how much was actually exercised was not presented. In the face of this ambiguity, it would be contrary to the standard of review for me to conclude that the Health Network and the Physician Group had full and total control to interfere in LVIDS' affairs. As a result, I will deny the motion as to this point.

### d) PHRA individual liability claims

The PHRA provides for individual liability where the person has aided or abetted acts of discrimination. Section 955(e) of the PHRA provides:

> (e) For any person, employer, employment agency, labor organization or employe, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

43 PA. CONS. STAT. ANN. § 955(e) (West 2008). This section of the PHRA clearly expresses the legislature's intent that "any person, whether or not an employer" can be held responsible for aiding or abetting unlawful discriminatory employment practices. Commonwealth v. Transit Casualty Ins. Co., 387 A.2d 58, 62 (Pa. 1978). Courts have allowed an individual supervisory employee to be held liable under this theory "for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren, P.C., 20 F. Supp.2d 885, 887 (E.D. Pa. 1998). However,

there can be no liability for refusing to remedy discrimination unless the plaintiff alleges that the party knew or should have known about the discrimination and refused to take remedial action. Dici v. Commonwealth, 91 F.3d 542, 553 (3d Cir. 1996).

Dr. Gerstadt has named five physicians—Drs. Fitzgibbons, Lapos, Ryan-Mitlyng, Vanbrakle, and Hart—who were involved in various parts of the application process. Each purportedly has supervisory authority.[7] The defendants claim that the complaint's factual allegations are insufficient for the individual liability claims. (Def.'s Mem. at 21.) Upon review of the complaint, I will grant the motion as to the claims raised against Dr. Fitzgibbons and will deny it with respect to the remaining individual defendants.

### 1) Claims against Dr. Fitzgibbons

I will dismiss the claim against Dr. Fitzgibbons. The complaint does not allege that he aided or abetted in any discrimination against Dr. Gerstadt. Dr. Fitzgibbons' involvement is limited to his failure to attend the credentialing committee meeting. (See Am. Compl. ¶¶ 45–48.) Equally important then is that he took no role in deciding whether to accept or deny her application. He is not alleged to have taken any other steps to oppose Dr. Gerstadt's credentialing. Without more, the complaint only states that Dr. Fitzgibbons failed to attend a meeting. No argument or allegation is made as to how that absence aided and abetted discriminatory activities.

---

[7] Dr. Fitzgibbons is Chair of the Department of Medicine for the Health Network. (Am. Compl. ¶ 9.) Dr. Lapos is President of the Medical Staff for the Health Network. (Id. ¶ 10.) Dr. Ryan-Mitlyng is Medical Director of the Physician Group. (Id. ¶ 12.) Dr. Vanbrakle is Chair of the Credentialing Committee for the Health Network. (Id. ¶ 11.) Dr. Hart is Vice President of Medical Staff Services for the Physician Group. (Id. ¶ 13.)

### 2) Claims against remaining physicians

I will deny the motion as to the remaining individual defendants. Whether the complaint presented sufficient facts for these remaining claims is a close question because each doctor's role is described but not concretely tied into the discrimination. Drawing reasonable inferences in Dr. Gerstadt's favor, I find that the complaint presents sufficient facts to state a claim and to give notice to each defendant.

As the first interviewer who witnessed the severity of Dr. Gerstadt's morning sickness, Dr. Lapos allegedly began the pattern of discrimination. (Am. Compl. ¶¶ 28–33.) The court was not presented any information as to content of Dr. Lapos' recommendation. Consequently, how exactly she discriminated against Dr. Gerstadt was not made clear, but the application process began to go poorly around that point. (Pl.'s Opp'n Mem. at 10–11.)

According to the complaint, Dr. Ryan-Mitlyng lied and mischaracterized one of Dr. Gerstadt's references. Even after up to seven positive recommendations were submitted on Dr. Gerstadt's behalf, Dr. Ryan-Mitlyng still did not support her application. (Am. Compl. ¶¶ 37–41.) Later on, Dr. Ryan-Mitlyng also sent a letter on behalf of LVIDS stating that the offer of employment had been withdraw because she was not granted staff privileges at the hospital. (Id. ¶¶ 49–51.)

Dr. Vanbrakle's alleged participation is linked to his position as chair of the Credentialing Committee  Though he initially "[saw] no problem with the application," it was denied anyway. (Id. ¶¶ 42–43.)

Dr. Hart sent a letter on behalf of the hospital stating that her application was considered withdrawn because LVIDS had withdrawn its offer of employment.

At this stage, these claims are tenuous and border on being unacceptably speculative. Discovery may yet yield firmer support for allowing them to go forward or dismissing them entirely. Accepting the plaintiff's allegations as true, I find that the complaint sets forth sufficient facts to state claims against Drs. Lapos, Ryan-Mitlyng, Vanbrakle, and Hart.

## IV. Conclusion

For the foregoing reasons, I will grant the motion in part and deny it in part. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KIMBERLY GERSTADT,** | : | **CIVIL ACTION** |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 08-4869 |
| | : | |
| **LEHIGH VALLEY INFECTIOUS** | : | |
| **DISEASE SPECIALISTS, et al.,** | : | |
| Defendants | : | |

**O R D E R**

**STENGEL, J.**

**AND NOW**, this 30th day of March, 2009, upon consideration of the defendant's partial motion to dismiss (Document #8) and the plaintiff's response thereto, it is hereby ORDERED that the motion is GRANTED, in part, and DENIED, in part, as follows:

(1)   The plaintiff's request for leave to file out of time is GRANTED;

(2)   The defendant's motion to dismiss the retaliation and hostile work environment claims contained in Count II is GRANTED, and those claims are DISMISSED;

(3)   The defendant's motion to dismiss Count III (Breach of Contract) is GRANTED, and Count III is DISMISSED;

(4)   The defendant's motion to dismiss the plaintiff's request for punitive damages with respect to Counts II and III is DISMISSED as moot;[1]

(5)   The defendant's motion to dismiss Count IV (Tortious Interference with Contractual Relations) is DENIED;

(6)   The defendant's motion to dismiss Count II, as against Dr. John Fitzgibbons, is GRANTED.  The Clerk shall terminate Dr. Fitzgibbons as a party in this matter;

---

[1] The plaintiff made no claim for punitive damages for Count II, and Count III has been dismissed.

(7)     The defendant's motion to dismiss Count II, as against Drs. Linda Lapos, Theresa Ryan-Mitlyng, John Vanbrakle, and John Hart, is DENIED.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.